In the

# United States Court of Appeals
## For the Seventh Circuit

———————

No. 07-1620

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ROGELIO BAUTISTA,

*Defendant-Appellant.*

———————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 05 CR 19—**James F. Holderman**, *Chief Judge.*

———————

ARGUED DECEMBER 7, 2007—DECIDED JULY 14, 2008

———————

Before EASTERBROOK, *Chief Judge*, and MANION and
KANNE, *Circuit Judges.*

MANION, *Circuit Judge.* On March 22, 2005, Rogelio
Bautista was indicted, along with four co-defendants,
for his role in a conspiracy to manufacture and distribute
methamphetamine. Bautista was convicted following a
four-day jury trial, and sentenced to 235 months in prison.
Bautista's sentence resulted, in part, from the district
court's findings that he was responsible for between five
and fifteen kilograms of methamphetamine, and that he
was not a minor or minimal participant in the conspiracy.
Bautista appeals these findings, and we affirm.

I.

During the summer of 2004, the Drug Enforcement Administration ("DEA") began investigating a methamphetamine ("meth") distribution operation run by Bautista's co-defendant, Heber Gomez-Albaranga. DEA Task Force Officer Luis Dominguez acted in an undercover capacity during the course of the investigation, posing as a drug dealer involved in the distribution of meth and cocaine. Dominguez was also the government's primary witness at Bautista's trial.[1] Dominguez expressed interest in purchasing meth from Gomez-Albaranga, and for that purpose Gomez-Albaranga introduced him to co-defendant Roberto Lopez in June or July 2004.

Dominguez eventually arranged to purchase one pound of meth from Lopez. When Dominguez met with Lopez on September 24, 2004, to complete the transaction, Lopez was accompanied by co-defendant Daniel Perez and another man known only as Luis. At Dominguez's suggestion, Lopez agreed to meet later that day at a gas station and travel from there to a nearby warehouse to complete the transaction. When Dominguez arrived at the gas station, he observed Lopez, Perez, and Luis speaking with the driver of a parked vehicle. At trial, Dominguez identified Bautista as the driver. Lopez approached Dominguez and informed him that Luis would ride in Dominguez's car, that Lopez would follow Dominguez, and that Bautista would follow Lopez. Dominguez raised concerns about too many people

---

[1] Unless otherwise noted, the facts that follow are taken from Dominguez's trial testimony.

proceeding to the warehouse, and Lopez assured him that it would only be himself, Luis, and Bautista.

While driving to the warehouse, Luis told Dominguez that the price for the meth was $11,000, and that $1,000 of that would be used to pay "the driver[2]." Once the caravan arrived at the warehouse, Luis exited Dominguez's vehicle and approached the one driven by Bautista. Dominguez also exited his vehicle, and he observed Bautista open a passenger-side compartment inside the car that would normally be used to house an air bag. Luis removed a four-inch square plastic bag from the compartment. Dominguez, Lopez, and Luis, but not Bautista, proceeded inside and completed the transaction. At trial, the parties stipulated that the bag contained 493 grams, or a little over one pound, of meth. Bautista also testified at trial, and he denied any involvement in this incident, stating that he does not own a car and does not have a driver's license.

A few months later, Dominguez met with Gomez-Alberanga and told him he had a source from whom he could obtain pseudoephedrine, the primary ingredient in meth. They agreed to move forward with an arrangement whereby Dominguez would provide pseudoephedrine and a laboratory in which to cook the meth, and Gomez-Alberanga would supply the remaining necessary chemicals and a chemist, or "cook," to carry out the process.

---

[2] Dominguez gave conflicting testimony regarding whether the $1,000 for the driver would be taken from the $11,000, or whether it was to be paid in addition to that amount. He testified unequivocally, however, that the driver to whom the $1,000 would be paid was Bautista.

Dominguez met with Lopez, Perez, and Bautista at a restaurant on January 4, 2005, to further discuss this plan. While all four men were seated at the same table, Dominguez told Lopez he could obtain five boxes of pseudoephedrine, each containing 30,000 sixty-milligram pills. Lopez responded positively and stated that that much pseudoephedrine would yield approximately twelve pounds of meth. Their conversation was in Spanish, the language spoken by Bautista, and Dominguez testified that Bautista sat no more than three feet away during the entire conversation. Testifying in his own defense, Bautista stated that he did not pay attention to what Dominguez and Lopez were talking about during this meeting, and that he was speaking only with Perez.

On January 24, 2005, Dominguez met with Gomez-Alberanga, Lopez, Perez, Bautista, and another co-defendant, Jose Olivas-Ramirez, to inspect the warehouse represented by Dominguez to be the lab location. Olivas-Ramirez was the cook to whom Gomez-Alberanga referred earlier. At trial, the jury watched a DEA surveillance video showing the men conversing and viewing different aspects of the premises, which was roughly the size of a two-car garage. At one point Olivas-Ramirez expressed concern about a gas heater in the warehouse with an open flame because of the combustible nature of the chemicals used in manufacturing meth. The video showed the entire group looking at the furnace. Gomez-Alberanga listed the items that would be needed including four buckets, alcohol and acetone in multiple gallon quantities, and a coffee maker. Olivas-Ramirez stated that with the proper materials and set-up, the warehouse would be adequate for cooking the meth, and like Lopez, he estimated he could manufacture up to

twelve pounds of meth from the pseudoephedrine Dominguez supplied. Dominguez described Bautista as standing anywhere from right next to Dominguez to ten feet away during this conversation. Bautista testified during his direct testimony that he only stayed in the warehouse for ten minutes before returning to the car to wait with Perez and warm up. On cross-examination, however, he admitted standing next to Dominguez and hearing the discussion set forth above.[3] At the conclusion of this meeting, Dominguez and Lopez agreed to meet the next day for delivery of the pseudoephedrine.

On January 25, 2005, Dominguez and another undercover agent met Gomez-Alberanga, Olivas-Ramirez, Lopez, Perez, and Bautista at Gomez-Alberanga's residence in Chicago to finalize their plans, and so that Olivas-Ramirez could give Dominguez some chemicals for the manufacturing process. At the direction of the defendants, Dominguez and the other agent went to a restaurant named Chela's to deliver the pseudoephedrine. A third undercover agent arrived in a vehicle carrying the pseudoephedrine. Dominguez, Lopez, and Bautista began carrying boxes of pseudoephedrine into the basement of Chela's. At this time, Dominguez observed many items used in meth manufacturing in the room to which they were bringing the pseudoephedrine, including cans of acetone, cutting agents, a funnel, a pitcher, a

---

[3] While not challenged on appeal, it is worth noting that Bautista's testimony regarding his conduct at the warehouse and on September 24, 2004, served as bases for the district court's enhancement of his offense level by two levels for obstruction of justice pursuant to U.S.S.G. § 3C1.1.

beaker, a flask, and coffee pot.[4] Dominguez and Bautista went outside to retrieve more pseudoephedrine, and when Dominguez handed Bautista another box, he was arrested.

A four-count indictment was returned against Bautista, Gomez-Alberanga, Lopez, Olivas-Ramirez, and Perez on March 22, 2005. Bautista was charged in Count One with conspiring from August 2004 until January 25, 2005, to manufacture and distribute 500 grams or more of meth, in Count Three with distributing approximately one pound of meth on September 24, 2004, and in Count Four with attempting to manufacture approximately 450 grams of meth on January 24 and 25, 2005. The case against Bautista proceeded to trial on November 7, 2005. In addition to the testimony noted above, Kreft testified generally regarding the process by which meth is manufactured. The government also asked Kreft how much meth could have been produced from the 150,000 pseudoephedrine pills. Bautista objected to this testimony, and his objection was sustained when Kreft admitted that he did not know how much meth the defendants could have made because of his lack of knowledge regarding their background and abilities in chemistry. On November 14, 2005, the jury returned a verdict finding Bautista guilty on all three counts in which he was charged.

Bautista's sentencing took place over four hearings during which Gomez-Alberanga, Olivas-Ramirez, and

---

[4] These items were subsequently analyzed by Robert Kreft, a forensic chemist with the Department of Justice. He determined that residue on the funnel and the coffee pot contained pseudoephedrine, and that the pitcher held a liquid containing meth and pseudoephedrine.

Perez testified in support of Bautista's motion for an offense level reduction based on minor or minimal participation in the conspiracy. Each of the men testified that they never discussed meth with Bautista, and Gomez-Alberanga repeatedly stated his belief that Bautista had nothing to do with the operation. The district court stated that upon consideration of the evidence presented at trial and sentencing, as well as after weighing the credibility of the witnesses, Bautista was not entitled to a reduction because he was involved enough to be "a regular member" of the conspiracy.

Bautista also argued at sentencing that the district court had before it no reliable evidence upon which it could find that the conspiracy involved more than the 493 grams of meth he delivered on September 24, 2004. 493 grams of meth would have given Bautista a base offense level of 30. U.S.S.G. § 2D1.1(c)(5) (2005). Bautista's argument was based primarily on Kreft's admission that he could not determine the amount of meth the defendants would have been able to manufacture. The government, on the other hand, argued that Bautista was responsible for at least five kilos of meth giving him a base offense level of 36. U.S.S.G. § 2D1.1(c)(2) (2005). The government's position was based, in pertinent part, on the 493 grams of meth Bautista delivered on September 24, 2004, and the twelve pounds, or 5.4 kilos, that Lopez and Olivas-Ramirez separately claimed could be made from the pseudoephedrine provided by Dominguez. The district court determined that the amount of meth involved was "beyond the 493 grams," and that in light of the available precursor drugs, the defendants' intent, and the likelihood that the defendants "would attempt to use their best efforts to make as much [meth] as they could

from the precursor ingredients that they had," Bautista was responsible for over five kilos of meth.

The district court ultimately determined that Bautista had an offense level of 38 and a criminal history of I resulting in a guideline range of 235 to 293 months, and imposed a sentence of 235 months. Bautista appeals his sentence, arguing that the district court had no reliable evidence upon which to base its finding that the conspiracy involved over five kilos, and that even if it did, the defendants did not have the capability to make that amount. Additionally, Bautista argues that the district court erred in denying his request for the offense level reduction available to minor or minimal participants in a conspiracy.

## II.

Any quantity of drugs foreseeably falling within the scope of jointly undertaken criminal activity is included when determining a defendant's relevant conduct. U.S.S.G. § 1B1.3, cmt. n. 2. (2005). When a quantity determination is being made, defendants have a due process right to be sentenced based on reliable information; district courts must therefore base their findings at sentencing on information having "sufficient indicia of reliability to support its probable accuracy." *United States v. Johnson*, 489 F.3d 794, 797 (7th Cir. 2007).

A seizure of the drugs involved in an offense provides a reliable basis for determining the quantity of drugs attributable to a defendant. However,

> [w]here there is no drug seizure or the amount seized does not reflect the scale of the offense, the court

shall approximate the quantity of the controlled substance. In making this determination, the court may consider, for example, the price generally obtained for the controlled substance, financial or other records, similar transactions in controlled substances by the defendant, and the size or capability of any laboratory involved.

U.S.S.G. § 2D1.1, cmt. n. 12. (2005). "Application Note 12 is designed to match the penalty to the true scale of the drug operation. . . . [T]he object of the Note is to move away from 'what was seized?' to 'how big was this drug business?'" *United States v. Eschman*, 227 F.3d 886, 892 (7th Cir. 2000) (Easterbrook, J., concurring). When seeking to approximate the quantity of drugs involved by way of reliable evidence, a district judge "may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come." *Johnson*, 489 F.3d at 796-97. We will disturb the result of that inquiry only if it is clearly erroneous; that is, "only if, after reviewing the entire evidence, we are left with the firm and definite conviction that a mistake has been made." *United States v. James*, 113 F.3d 721, 730 (7th Cir. 1997).

Bautista does not dispute inclusion of the 493 grams he delivered on September 24, 2004 in his relevant conduct. The issue then becomes whether the twelve pounds discussed by Bautista's co-defendants was sufficiently reliable to support Bautista's sentence. We conclude that it was. First, two separate co-defendants testified that they would be able to make twelve pounds, or 5.4 kilos, of meth from the pseudoephedrine provided by Dominguez-Lopez at the January 4, 2005 meeting, and Olivas-Ramirez at the January 24, 2005 meeting. Isolated

statements by criminals, even those high-ranking within an operation, are not necessarily sufficiently reliable to approximate the drug amount attributable to a defendant. However, these were consistent statements regarding the operation's capability which were made a few weeks apart by Lopez, who was at or near the top of this conspiracy, and Olivas-Ramirez, the meth cook.[5] *See United States v. Morrison*, 207 F.3d 962, 968 (7th Cir. 2000) (concluding that consistent statements by witnesses who participated in cooking sessions with the defendant were reliable and could be relied on by a court in determining the quantity of drugs attributable to a defendant).

The defendants' lab had not been set up, but the court was still able to consider what its capability would have been because Olivas-Ramirez only gave Dominguez the twelve-pound number after he received assurances that the lab would be outfitted according to his requests. Additionally, the probable accuracy of the twelve-pound quantity was increased by evidence that the group was already involved in meth manufacture as shown by the operational lab in Chela's basement. Finally, if the 493 grams for which Bautista concedes he is responsible is

---

[5] After pleading guilty to the charges against him, Olivas-Ramirez argued for a minor role reduction, stating that he only pretended to be the cook, and had been instructed by Lopez on how to conduct himself during the warehouse meeting. *United States v. Olivas-Ramirez*, 487 F.3d 512, 515 (7th Cir. 2007). The district court did not believe him and not only denied the minor role reduction, but denied him a safety valve reduction under U.S.S.G. § 5C1.2 based on its belief that he had not truthfully disclosed his role in the offense. We affirmed. *Id.* at 517.

added to the twelve pounds, the result is approximately 5.9 kilos. This means that, when taken in total, the evidence before the district court provided a buffer of almost 900 grams before the attributable quantity of meth would slip under five kilos and warrant a reduced base offense level. *See United States v. Hollins*, 498 F.3d 622, 631 (7th Cir. 2007) (noting that "although evidence of drug quantity must be more than speculative, nebulous eyeballing, the sentencing guidelines permit *some* amount of reasoned speculation and reasonable estimation by a sentencing court") (quotation omitted).

Bautista makes much of Kreft's inability to state how much meth the defendants could have made from the 150,000 pseudoephedrine pills. In doing so, he places inordinate emphasis on lab capability in determining meth quantity. Lab size and capability were included in Application Note 12 of U.S.S.G. § 2D1.1 only as an example of the type of information that could be considered by the district court when approximating drug quantity. Our language in *Eschman* that this approximation should be made with regard for "a particular defendant's capabilities when viewed in light of the drug laboratory involved," *Eschman*, 227 F.3d at 890, should not be read to impose a requirement that a lab must be functioning before approximating the amount of meth attributable to a defendant. Here, the members of an experienced meth operation believed they were going to have a lab outfitted with whatever they needed, and that this would allow them to manufacture twelve pounds of meth. That evidence, especially when combined with the 493 grams undisputed by Bautista, provided a basis for attributing to him at least five kilograms of meth. Kreft's inability to specifically quantify the

defendant's meth manufacturing capability does not undermine the district court's finding.[6]

Bautista argues briefly in the alternative that even if there was reliable evidence that the offense involved more than five kilos, there was no evidence that any of the defendants was capable of manufacturing that much meth. Bautista bears the burden on this point because Application Note 12 of U.S.S.G. § 2D1.1 shifts the burden to a defendant who argues that he was not capable of manufacturing the disputed drug amount. *United States v. Wash*, 231 F.3d 366, 373 (7th Cir. 2000). Other than characterizing figures over five kilos as "nothing more than guesswork, braggadocio, or perhaps wishful thinking," Bautista offers little to undermine the district court's finding that the amount of meth involved was between five and fifteen kilos based on the available precursor drugs, the defendants' intent, and the likelihood that the defendants would use their best efforts to make as much meth as possible from the precursor ingredients. Bautista's argument is insufficient to meet his burden.

Finally, Bautista argues that the testimony and evidence put forward at trial and sentencing establish that he was a minor or minimal participant in the conspiracy, and that he was therefore entitled to a role reduction under U.S.S.G. § 3B1.2. Like the district court's determination

---

[6] At sentencing, the government also discussed, but did not introduce, a DEA lab report quantifying the amount of meth found in Chela's basement, as well as what a 100% meth yield from the pseudoephedrine would have been. Because this report is not determinative of whether more than five kilos of meth were attributable to Bautista, we do not address it.

regarding drug quantity, its determination of whether Bautista was a minor or minimal participant is reviewed for clear error. *United States v. Mendoza*, 457 F.3d 726, 729 (7th Cir. 2006). Under § 3B1.2(a), a four-level reduction is available for minimal participants, described in Application Note 4 as "defendants who are plainly among the least culpable of those involved in the conduct of a group." Under § 3B1.2(b), a two-level reduction is available for minor participants, described in Application Note 5 as "less culpable than most other participants, but whose role could not be described as minimal."

In addition to Dominguez's trial testimony describing the role of each of the defendants, the testimony of Gomez-Alberanga, Olivas-Ramirez, and Perez at sentencing supports the conclusion that Bautista was not at the top of the defendants' meth operation. Bautista was portrayed as a predominantly silent figure traveling around with Lopez while Lopez arranged and carried out deals with Dominguez. However, his constant presence with Lopez must be accorded some importance. *See Mendoza*, 457 F.3d at 730 ("One of the factors that sentencing judges should examine while assessing a defendant's role in a criminal enterprise is the defendant's relationship with the enterprise's principal members."). The trust Lopez placed in Bautista was clear from the evidence showing that Lopez discussed his transaction with Dominguez in front of Bautista, took Bautista along to the lab site, and enlisted Bautista to help carry the pseudoephedrine into a functioning meth lab in the basement of Chela's.

Additionally, it is notable that Bautista drove the vehicle containing the pound of meth on September 24, 2004. *See United States v. Rodriguez-Cardenas*, 362 F.3d 958, 960 (7th Cir. 2004) (finding no clear error in denying a minor

role reduction for a defendant who made two drug deliveries because of the important role couriers play in drug distribution). In *Mendoza*, we affirmed the district court's denial of a role reduction based upon the apparent close relationship the defendant had with the ringleader, and the fact that the defendant acted as a courier. *Mendoza*, 457 F.3d at 729-30. Both of those factors are present here. The district court stated that it reviewed the trial and post-trial evidence, found that Bautista was involved "on several different days in different ways," and concluded that Bautista was not entitled to a role reduction. We are not left with the "definite and firm conviction that a mistake has been committed" necessary to reverse. *Id.* at 729.

## III.

We conclude that the district court was presented with sufficiently reliable information to support its determination that Bautista was responsible for between five and fifteen kilos of meth, and further conclude that Bautista was unsuccessful in showing that he and his co-defendants were incapable of producing a quantity of meth within that range. Additionally, the district court's conclusion that Bautista was not a minimal or minor participant in the meth conspiracy was not clearly erroneous. Accordingly, we AFFIRM Bautista's sentence.