In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 07-1657, 07-2685 & 07-3083

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

RAY LONGSTREET, MICHAEL ERVIN,
and ANSELMO ZEPEDA,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 05 CR 471—**Matthew F. Kennelly**, *Judge.*

ARGUED NOVEMBER 3, 2008—DECIDED JUNE 8, 2009

Before KANNE, EVANS, and SYKES, *Circuit Judges.*

KANNE, *Circuit Judge*. Ray Longstreet, Michael Ervin, and Anselmo Zepeda were among twenty-nine defendants charged with a variety of federal offenses arising from their participation in a large drug operation on the west side of Chicago. The defendants ranged from suppliers to gang leaders to low-level, street-corner drug dealers. All twenty-nine defendants were indicted for, *inter alia*, a conspiracy to possess and distribute controlled sub-

stances. Unfortunately, we see many cases involving large drug conspiracies. It is disheartening to know that when the legal system removes one drug conspirator from the street, someone else will quickly fill the void. But as long as the actions occur, we must deal with the actors.

Of the three appellants, only Longstreet—the leader of the west side faction of the Four Corner Hustlers—proceeded to trial, where a jury found him guilty of a number of charges. Ervin and Zepeda both pled guilty. The district court sentenced Longstreet, Ervin, and Zepeda to 456, 300, and 210 months in prison, respectively. On appeal, Longstreet challenges his conviction, and all three defendants present issues regarding their sentences.

## I. BACKGROUND

This case involves a widespread drug operation on Chicago's troubled west side, and the twenty-nine co-defendants included individuals involved in all aspects of the business. The primary player for purposes of this appeal is Ray Longstreet, who was the alleged "chief" of the west side faction of a street gang named the Four Corner Hustlers. Longstreet oversaw a drug network that trafficked in heroin, cocaine, crack, and marijuana. Longstreet's activities included coordinating the purchase, mixture, and packaging of substances containing heroin and crack; directing drug sales by lower-level gang members; collecting "street rent" from dealers in exchange for permission to sell drugs in his territory; and controlling the types of drugs available and the street corners on which the dealers sold them.

Michael Ervin was a mid-level gang operative who allegedly served as Longstreet's "enforcer" and also sold heroin on Longstreet's behalf. Unlike the other two appellants, Anselmo Zepeda was involved on the conspiracy's supply side; he allegedly fronted other dealers large quantities of drugs to be repackaged and resold on the streets. The remaining details reflect an all-too-common illegal drug operation, and we see no need to describe them further except as they relate to the analysis below.

In 2004, the Chicago Police Department and the Drug Enforcement Agency began investigating drug trafficking in the area controlled by the Four Corner Hustlers. The investigation included live and video surveillance of Longstreet and his co-conspirators, undercover purchases at one of Longstreet's corners, and court-authorized wiretaps relating to three telephone numbers. In total, law enforcement recorded between 3,000 and 5,000 calls on one telephone belonging to Longstreet and two telephones belonging to Anthony Sutton, a crack cocaine dealer who operated in Longstreet's territory. Many of the calls revealed the mechanics of a modern-day drug business. At Longstreet's trial, the government played over one hundred of these calls, many of which involved Longstreet and nearly all of which related to drug activity.

On September 14, 2005, a grand jury returned a sixty-seven-count indictment, Count One of which charged twenty-nine individuals with a single conspiracy to possess with intent to distribute, and to distribute, controlled substances in violation of 21 U.S.C. § 846. The

controlled substances included mixtures and substances containing cocaine, heroin, marijuana, and cocaine base in the form of crack. The three appellants were also charged with a number of other offenses related to their participation in the drug operation.

Longstreet proceeded to trial, and the government, in addition to introducing the recorded telephone conversations, called law enforcement officers and four cooperating witnesses, each of whom testified about his or her interactions with Longstreet. The key government witness was Anthony Sutton, who testified extensively about Longstreet's various roles in the local drug business, as well as Sutton's own role as a drug dealer. After a week-long trial, the jury convicted Longstreet for his participation in the conspiracy and several related offenses. On March 19, 2007, the district court sentenced Longstreet to 456 months in federal prison on the conspiracy charge.[1]

Ervin and Zepeda each pled guilty to the conspiracy charge and two related offenses. On May 23, 2007, the district court sentenced Ervin to 300 months in prison. On August 9, the district court sentenced Zepeda to 210 months in prison.

---

[1] The district court also sentenced Longstreet to concurrent prison sentences on the related offenses. Longstreet does not challenge those convictions, and we need not address them.

## II. ANALYSIS

We consolidated the defendants' cases for appeal. Each co-defendant raises separate issues, and we address each of them in turn. We first consider Longstreet's challenges to both his conviction and his sentence. We next address the sole issue that Ervin presents, which Longstreet raises as well: whether a limited remand is appropriate for the district court to consider the disparity created by the Sentencing Guidelines' crack/powder cocaine ratio. Last, we address Zepeda's challenges to his sentence.

### A. Longstreet's Challenges to His Conviction and Sentence

Longstreet challenges both his conviction and his sentence, and he raises four issues: (1) whether the government produced sufficient evidence to prove that he was part of the charged conspiracy; (2) whether the district court properly instructed the jury regarding multiple conspiracies; (3) whether the district court properly precluded him from calling Andre Kincaid to testify about drug purchases from a co-conspirator; and (4) whether the court properly sentenced him to 456 months in prison.

### 1. Fatal Variance/Sufficiency of the Evidence

Longstreet first claims that there was a prejudicial variance between the conspiracy charged and the evidence produced at trial. According to him, the proof demon-

strated, at best, a number of smaller conspiracies, rather than one unified conspiracy including him and Anthony Sutton. Although Longstreet makes a belated effort to separate himself from the activities of other co-conspirators, particularly Sutton, we find his argument unavailing.

A variance arises when the facts proved at trial differ from those alleged in the indictment. *United States v. Griffin*, 493 F.3d 856, 862 (7th Cir. 2007). In a conspiracy case, we treat a defendant's variance claim as a challenge to the sufficiency of the evidence supporting the jury's finding that the defendant was a member of the charged conspiracy. *Id.* To succeed, Longstreet must establish that (1) the evidence at trial was insufficient to support the jury's finding that he belonged to a single conspiracy, and (2) he was prejudiced by the variance. *United States v. Jones*, 275 F.3d 648, 651 (7th Cir. 2001). We view the evidence in the light most favorable to the government and will overturn a conviction only if the record contains no evidence from which a reasonable juror could have found the defendant guilty. *United States v. Rollins*, 544 F.3d 820, 835 (7th Cir. 2008). The defendant's "heavy" burden when challenging a conviction for insufficiency of the evidence is "nearly insurmountable." *United States v. Moses*, 513 F.3d 727, 733 (7th Cir. 2008) (quotations omitted); *see also United States v. Melendez*, 401 F.3d 851, 854 (7th Cir. 2005) ("Sufficiency of the evidence challenges rarely succeed because we owe great deference to the jury's verdict.")

Therefore, we must determine whether the record contains sufficient evidence for a reasonable juror to have

found Longstreet guilty of the conspiracy in Count One of the indictment. A conspiracy exists when two or more people agree to commit an unlawful act, and the defendant knowingly and intentionally joins that agreement. *Rollins*, 544 F.3d at 835. A conspiracy under 21 U.S.C. § 846 requires "'substantial evidence that the defendant knew of the illegal objective of the conspiracy and agreed to participate.'" *Id.* (quoting *United States v. Thornton*, 197 F.3d 241, 254 (7th Cir. 1999)).

In proving a conspiracy, the government need not establish with whom the defendant conspired; it must simply prove "'that the defendant joined the agreement alleged, not the group.'" *Griffin*, 493 F.3d at 862 (quoting *United States v. Stigler*, 413 F.3d 588, 592 (7th Cir. 2005)). "So long as the evidence demonstrates that the co-conspirators embraced a common criminal objective, a single conspiracy exists, even if the parties do not know one or another and do not participate in every aspect of the scheme." *Jones*, 275 F.3d at 652. For a drug conspiracy, "[a]ll that is necessary is 'enough circumstantial evidence to support, beyond reasonable doubt, an *inference* that the defendants agreed among themselves to distribute drugs.'" *United States v. Pagan*, 196 F.3d 884, 889 (7th Cir. 1999) (quoting *United States v. Townsend*, 924 F.2d 1385, 1390 (7th Cir. 1991)).

In this case, the government introduced ample evidence from which a reasonable juror could have found that Longstreet knowingly agreed with others to distribute illegal drugs. As long as such evidence was before the jury, its verdict must stand; it is the jury's role to deter-

mine the credibility of the witnesses and weigh the evidence. *Rollins*, 544 F.3d at 835; *see also Pagan*, 196 F.3d at 889. It is unnecessary to recount all of the facts of this case; we will merely note a few pieces of evidence that adequately support the jury's verdict. The government presented evidence that Longstreet controlled drug trafficking in a particular area, operated his own drug business by hiring employees to package and sell heroin, and collected rent from dealers in exchange for the right to sell drugs on street corners that he controlled. The jury not only saw witnesses testify to these facts, but it also heard multiple wiretapped phone conversations between Longstreet and co-conspirators discussing drugs, guns, and territory. This evidence supports the conspiracy conviction.

First, evidence demonstrated that Longstreet operated his own heroin business, which Longstreet does not appear to contest on appeal. Several witnesses testified that Longstreet purchased large quantities of heroin from multiple suppliers, who often fronted him the drugs expecting to be repaid from the proceeds of their sale. *Cf. United States v. Bustamante*, 493 F.3d 879, 884-85 (7th Cir. 2007) (noting that factors indicating a drug conspiracy include transactions involving large quantities of drugs and sales on credit). Various co-conspirators explained that Longstreet employed them to assist in mixing and repackaging the drugs, to sell heroin at his drug spots on the streets, to collect the proceeds, and, if necessary, to act as his "enforcers." This evidence indicates that Longstreet was neither an individual, disinterested drug distributor, nor engaged in a single

drug transaction. *Cf. id.* at 884 ("[B]uying and selling drugs, without more, does not constitute a conspiracy.").

Second, there was plentiful evidence indicating a criminal agreement between Longstreet and Anthony Sutton. Sutton testified that Longstreet was the chief of the Four Corner Hustlers and that he controlled the territory bordered by Pulaski Avenue, Chicago Avenue, Hamlin Avenue, and Division Street. Sutton explained that Longstreet was in a position of power over him and other dealers, that Longstreet enlisted employees to handle problems with the dealers, and that Longstreet required the dealers—including Sutton—to pay rent for the right to sell drugs in his territory. Sutton's drug spot was located in front of Longstreet's home, and Sutton stopped paying rent only when "Ray Longstreet told him he didn't have to anymore." During cross-examination, Sutton testified that when he first reopened this spot in 2002, three of Longstreet's employees separately demanded rent, using Longstreet's name expressly. The record is littered with evidence—including multiple recorded telephone calls between Longstreet and Sutton—reflecting, at least, an agreement between Longstreet and Sutton to coordinate their own drug sales, and, at most, Longstreet's efforts to control the drug sales of many dealers in the area.

Sutton also contradicted one of the theories that Longstreet propounded in an effort to undermine a single conspiracy. Longstreet argued that the two men competed with one another for heroin sales, which he claims indicated that they were operating two separate

conspiracies. According to Sutton, however, he and Longstreet agreed that Sutton would sell crack cocaine, while Longstreet would sell heroin. Sutton stated a number of times, including during cross-examination, that he did not sell heroin. Longstreet attempted to introduce evidence to the contrary, which we address below, but even if we assume that Sutton competed with Longstreet by selling heroin on occasion, the other evidence still suggests that they joined in a single agreement to possess and distribute illegal drugs. *See United States v. Maholias*, 985 F.2d 869, 876 (7th Cir. 1993) ("Conspirators who distribute drugs often sell in parallel strands rather than in links essential to one another.").

Longstreet goes to great lengths to separate himself from Sutton, explaining how he lacked control over Sutton; that Sutton sold his own drugs and withheld from him information and profits; that Longstreet was in prison or on house arrest during some relevant time periods; and that Longstreet "was not a drug kingpin" overseeing a large drug dealing operation. But none of these affect the quintessential elements of a conspiracy. These arguments, which perhaps suggest that Longstreet was not omnipotent or overly successful at his business, do not change the fact that there was evidence to support a reasonable juror's finding that Longstreet *agreed* with others—Sutton included—to possess and distribute controlled substances. The charge did not require the jury to find that Longstreet was a "kingpin"—it merely required the government to prove that he joined a criminal conspiracy to possess and distribute illegal drugs, which

is exactly what Sutton and his fellow co-conspirators said that Longstreet did.

There is evidence in the record from which a reasonable juror could have found Longstreet guilty of the conspiracy charged in the indictment. True, much of the evidence came from Anthony Sutton, an admitted drug dealer. But as we have already stated, if there is evidence supporting a reasonable juror's conclusion, it is up to the juror, not this court, to evaluate and weigh that evidence. *Rollins*, 544 F.3d at 835; *see also Pagan*, 196 F.3d at 889 ("The extent to which [a witness's] personal failings and motivations may have influenced his testimony was for the jury to decide."). Because a rational jury could have believed the witnesses' testimony, there was no variance between the charge and the evidence produced at trial.

2.  *Absence of a Jury Instruction Regarding Evidence of Multiple Conspiracies*

Longstreet's second challenge to his conviction is that the district court should have instructed the jury not to consider evidence related to any separate, distinct conspiracy when considering Longstreet's guilt. Without such an instruction, he argues, the jury was free to consider criminal activity unrelated to him when rendering its verdict, thereby prejudicing him.

Prior to trial, Longstreet proposed jury instructions that included a multiple conspiracy instruction. At the end of the trial, the government proposed its own multiple conspiracy instruction, which the district court

accepted after a brief discussion among counsel; Longstreet's counsel stated that he would accept that instruction. The instruction stated that the jury may find the existence of multiple conspiracies, rather than a single one, and it informed the jury that it must base this decision "only on what the defendant did or said." It did not, however, expressly instruct the jury to disregard evidence of conduct in any conspiracy in which it might find that the defendant did not participate.

We typically review an attack on a jury instruction for an abuse of discretion, but when the underlying error implicates a question of law, we review *de novo*. *United States v. Macedo*, 406 F.3d 778, 787 (7th Cir. 2005). However, because Longstreet agreed to the instruction as written and failed to request a component directing the jury not to consider evidence of unrelated conspiracies, he forfeited this challenge on appeal,[2] and we review for plain error. *See United States v. Trennell*, 290 F.3d 881, 886 (7th Cir. 2002); *see also United States v. Olano*, 507 U.S. 725, 732 (1993) (explaining that error must be plain and affect defendant's substantial rights to merit reversal).

We find no plain error here. Longstreet is correct that *if* the evidence produced at trial does not support the

---

[2] The government concedes that Longstreet did not *waive* his challenge by expressly agreeing to the multiple conspiracy instruction. *Cf. United States v. Griffin*, 493 F.3d 856, 863 (7th Cir. 2007). We agree because Longstreet did not intentionally relinquish his right to seek an *additional* instruction that the jury could not use against him any evidence of conspiracies of which he was not a part.

conspiracy alleged in the indictment, the court should instruct the jury "that evidence relating to the other conspiracy or conspiracies disclosed may not be used against him under any circumstances." *United States v. Lindsey*, 602 F.2d 785, 787 (7th Cir. 1979) (quotations omitted). But that is as far as Longstreet's argument takes him.

First, the evidence at trial supported the conspiracy alleged in the indictment; we have already determined that there was no variance. Therefore, there was no "other conspiracy" disclosed at trial. Second, the absence of an express instruction to disregard any potential evidence of another conspiracy did not deprive Longstreet of a fair trial. *See Olano*, 507 U.S. at 732 (noting that a court of appeals has discretion to correct a plain error and "should not exercise that discretion unless the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings" (alteration in original) (quotations omitted)). The district court's instruction properly informed the jury of the requirements for a conspiracy conviction and that it was only allowed to evaluate Longstreet's own words and conduct to determine the conspiracies, if any, in which he participated. The instruction also stated that the jury could find Longstreet guilty only if he participated in the conspiracy alleged in the indictment. Further, the district court advised the jury that it should consider the convictions of the testifying co-conspirators for credibility purposes only, not to determine Longstreet's guilt. In light of the entire instruction, the court did not commit plain error.

### 3. *Proposed Testimony of Andre Kincaid*

Longstreet's third challenge to his conviction is that the district court improperly prohibited him from questioning co-defendant Andre Kincaid about Anthony Sutton. As noted, Longstreet claimed that Sutton operated a distinct conspiracy in which Sutton competed with Longstreet to sell heroin. Sutton, however, testified that the two men had an agreement to sell different drugs within Longstreet's territory. At trial, Sutton claimed that he sold only cocaine, crack, and marijuana, meaning that his drug dealing activity did not conflict with Longstreet's heroin business. Sutton denied selling heroin in 2004 and specifically denied selling it to Andre Kincaid.

Longstreet sought to impeach Sutton with testimony from Kincaid, who pled guilty to participating in the conspiracy and admitted to purchasing cocaine and crack from Sutton. In addition to crack purchases, Kincaid had previously informed the government that he purchased heroin from Sutton, that he saw Sutton's workers giving heroin away, and that Sutton had an international heroin source. The district judge was prepared to permit Kincaid to testify to these facts over the government's objection that it was an improper collateral impeachment.

Before testifying, however, Kincaid invoked his Fifth Amendment right against self-incrimination, which the district court accepted. The court then determined that Kincaid was unavailable to testify, *see* Fed. R. Evid. 804(a)(1), and permitted Special Agent Chris Carlson of the Internal Revenue Service to testify regarding Kincaid's prior proffer, *see id.* 804(b)(3). Agent Carlson was present

at Kincaid's interview, and he testified that Kincaid provided the government with the information stated above. Longstreet asserts that the court erred because he only intended to call Kincaid to testify about what he had seen, not what he had done, i.e., there was no possibility that Kincaid's testimony could be self-incriminating.

The Fifth Amendment ensures that a criminal defendant shall not "be compelled . . . to be a witness against himself." U.S. Const. amend. V. Such a right "must be confined to instances where the witness has reasonable cause to apprehend danger from a direct answer." *Hoffman v. United States*, 341 U.S. 479, 486 (1951). Thus, when a witness invokes his Fifth Amendment right, the district court should confirm that he "cannot possibly incriminate himself," and if the "witness's testimony may make him vulnerable to prosecution, the trial court may allow him to . . . refuse to testify." *United States v. Mabrook*, 301 F.3d 503, 506 (7th Cir. 2002). Because Kincaid had not yet been sentenced when asked to testify, he retained the ability to invoke his guarantee against self-incrimination. *See Mitchell v. United States*, 526 U.S. 314, 325 (1999). We review a district court's Fifth Amendment privilege determination for an abuse of discretion. *Mabrook*, 301 F.3d at 506.

Although Longstreet characterizes Kincaid's proffered testimony as encompassing only his observations of others, the record tells a different story. Throughout the discussions regarding Kincaid's testimony, the government, Longstreet's counsel, and the district court referred to Kincaid's prior statements that he had purchased heroin

from Sutton, and the record reflects that these state-
ments were the primary focus of the dispute. Longstreet's
counsel added that Kincaid observed Sutton's other
heroin activities, but he also noted a number of times
that Kincaid bought heroin from Sutton. If questioned
about this activity, the answers certainly had the
potential to incriminate Sutton, and such testimony falls
squarely within the ambit of the privilege against self-
incrimination.

On appeal, Longstreet argues that the district court could
have permitted questioning about some of Kincaid's
observations, yet prevented questions directly implicating
him. Longstreet's counsel never made this argument to
the district court. In fact, Longstreet's primary argument
in favor of allowing Kincaid's testimony was that
Kincaid relinquished or waived his Fifth Amendment
privilege by voluntarily making his prior proffer to the
government, an argument the court considered and
appropriately rejected.

But even if Longstreet had sought to limit Kincaid's
testimony before the district court, Kincaid still could
have refused to take the stand. A testifying witness
"cannot deprive the opposing party of the right of cross-
examination." *United States v. Herrera-Medina*, 853 F.2d 564,
567-68 (7th Cir. 1988). Consequently, a witness may not
choose to testify and then "assert the Fifth Amendment
privilege with respect to specific questions if they are
within the scope of his testimony." *Id.* at 567. Thus, even
if Kincaid's testimony on direct examination was limited
to non-incriminating statements, his testimony would

have exposed him to "broad-ranging cross-examination," *id.*, the proper scope of which could have included his heroin transactions with Sutton and other potentially incriminating information. Kincaid could have been incriminated by his answers to these questions, and, therefore, "[h]is fear of self-incrimination was hardly fanciful." *Id.* at 568 (quotations omitted).

Last, Longstreet did not suffer prejudice from the exclusion of Kincaid's testimony. The district court permitted Agent Carlson to tell the jury exactly what Longstreet wanted Kincaid to say, and Longstreet has not suggested any information that he was unable to present as a result of Kincaid's unavailability. Longstreet cannot demonstrate a reasonable possibility that Kincaid's testimony would have altered the jury's verdict. *See United States v. Castaldi*, 547 F.3d 699, 705 (7th Cir. 2008). Consequently, the district court did not abuse its discretion by permitting Kincaid to invoke his Fifth Amendment privilege.

*4. Longstreet's Sentencing Issues*

Finally, Longstreet challenges his sentence. After hearing argument from both sides, the district court found that Longstreet had a base offense level of thirty-eight and a criminal history that placed him in sentencing category six. The court added a two-level enhancement for possession of a gun and a four-level enhancement for his leadership role in the conspiracy, resulting in a final offense

level of forty-four.[3] The advisory Sentencing Guidelines range was life imprisonment, but the district court imposed a below-Guidelines sentence of 456 months. Longstreet contests that the district court committed two errors that improperly increased his sentence: (1) attributing to him drug quantities from sales that did not relate to him; and (2) imposing the leadership role enhancement.

### a.  Drug Quantity Attributable to Longstreet

Longstreet first challenges the district court's calculations of the drug quantities used to establish his base offense level under the 2006 version of the Sentencing Guidelines. At sentencing, the government has the burden of proving the quantity of drugs attributable to a defendant by a preponderance of the evidence. *United States v. Krasinski*, 545 F.3d 546, 551 (7th Cir. 2008). Although the district court is not limited to evidence admissible at trial, *United States v. Clark*, 538 F.3d 803, 812 (7th Cir. 2008), it must base its sentence on information with "sufficient indicia of reliability to support its probable accuracy," *United States v. Bautista*, 532 F.3d 667, 672 (7th Cir. 2008) (quotations omitted). We review the district court's factual findings regarding drug quantity for clear error, *id.*, which is a "highly deferential standard of review[,] and we refuse

---

[3]  Because this total offense level was above the highest offense level in the sentencing table, the district court applied the highest offense level, forty-three.

to second-guess the sentencing judge," *Clark*, 538 F.3d at 812 (quotations omitted).

According to the Sentencing Guidelines, a defendant is "accountable for all quantities of contraband [including controlled substances] with which he was directly involved and, in the case of a jointly undertaken criminal activity, all reasonably foreseeable quantities of contraband that were within the scope of the criminal activity that he jointly undertook." U.S. Sentencing Guidelines Manual (U.S.S.G.) § 1B1.3(a)(1) cmt. n.2 (2006); *see also Bautista*, 532 F.3d at 672; *United States v. Nubuor*, 274 F.3d 435, 443 (7th Cir. 2001) (noting that the district court may sentence a defendant "for drug quantities that he did not handle, so long as he could reasonabl[y] foresee that the drug transactions would occur"). Further, "[t]he guidelines' concept of reasonable foreseeability does not require that a coconspirator be aware of the precise quantity involved in each of an ongoing series of illegal transactions." *United States v. Scroggins*, 939 F.2d 416, 423 (7th Cir. 1991). Having already determined that Longstreet and Sutton engaged in a single criminal conspiracy, we must now consider whether Sutton's crack cocaine sales should be attributed to Longstreet as "reasonably foreseeable" transactions within the scope of their conspiracy.

The probation officer recommended in Longstreet's presentence investigation report (PSR) that he be held responsible for at least 1.5 kilograms of crack cocaine and three kilograms of heroin. According to the Sentencing Guidelines, this quantity of crack alone placed him at the highest base offense level, thirty-eight. *See* U.S.S.G.

§ 2D1.1(c)(1) (Drug Quantity Table) (2006). The district court, after examining the PSR and hearing argument from the government and defendant, agreed with the probation officer's recommendation of a base offense level of thirty-eight.

The driving force behind Longstreet's base offense level was the quantity of crack cocaine dealt by Anthony Sutton. Specifically, the district court found that Longstreet was accountable for at least 1.5 kilograms of crack handled by Sutton. Because this quantity of crack provided a sufficient basis for the recommended offense level, *see id.*, the court did not address Longstreet's heroin quantities, nor did it incorporate drugs moved at any other operators' drug spots within Longstreet's territory.[4]

Longstreet asserts that Sutton's crack sales should not be attributed to him because Sutton operated his own conspiracy and did not share profits or details of his drug sales. We discard much of this argument based on our determination above that the evidence supports a single conspiracy. According to the previously described arrangement between the two men, Sutton sold crack at an estimated 1.5 ounces per day, seven days a week, over a nearly

---

[4] The government concedes that there was an error in the PSR's calculation of heroin quantities attributable to Longstreet. This error did not affect Longstreet's base offense level, however, because the district court did not reach the PSR's heroin calculations, and we find that the court properly attributed Sutton's crack cocaine sales to Longstreet. This quantity alone places Longstreet at a base level of thirty-eight.

three-year period. To reach the 1.5 kilogram quantity that the district court calculated, Longstreet would have to be attributed with only 53 ounces of crack.[5] At a rate of 1.5 ounces per day, this would have taken a mere 36 days. Sutton's testimony clearly supports this amount. *See* U.S.S.G. § 2D1.1 cmt. n.12 (2006) ("Where there is no drug seizure or the amount seized does not reflect the scale of the offense, the court shall approximate the quantity of the controlled substance."); *Krasinski*, 545 F.3d at 552 ("A district court may use a reasonable estimate of the quantity of drugs attributable to a defendant for guidelines purposes.").

The district judge chose to credit Sutton's testimony, finding that although the two men did not expressly share their profits, they were part of a single conspiracy in which Sutton paid Longstreet rent for the right to sell drugs in his territory. Therefore, Sutton's crack sales were within the scope of the conspiracy. If Sutton's testimony is true, such an agreement certainly renders future crack sales reasonably foreseeable to Longstreet. That Sutton was a potentially self-interested drug dealer does not preclude the district court from crediting his testimony, for a district court's determination of a witness's credibility is "entitled to great deference and can virtually never be clear error." *Clark*, 538 F.3d at 813 (quotations omitted). We find no such error here; the district court properly calculated Longstreet's base offense level.

---

[5]  One kilogram equals 35.2739 ounces. Therefore, 1.5 kilograms equals 52.9109 ounces.

*b. Leadership Role Enhancement*

In addition to setting Longstreet's base offense level, the district court applied a four-level enhancement based on Longstreet's leadership role in the conspiracy. Longstreet contends that the evidence presented at trial did not support the court's finding that he was an organizer or leader. We review the district court's leadership enhancement for clear error, which exists only when "we are left with a definite and firm conviction that a mistake has been made." *United States v. Hatten-Lubick*, 525 F.3d 575, 580 (7th Cir. 2008).

Under § 3B1.1 of the Sentencing Guidelines, a district court may enhance a defendant's sentence by four levels if it determines that he "was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a) (2006). Longstreet does not dispute that the conspiracy in this case involved more than five participants, and thus we focus on Longstreet's role within it.

To receive any § 3B1.1 increase for an aggravated role, the defendant must, at a minimum, "have had some real and direct influence, aimed at furthering the criminal activity, upon one other identified participant." *United States v. Mustread*, 42 F.3d 1097, 1103 (7th Cir. 1994). In deciding to apply the enhancement, courts should consider:

> the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the

crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

U.S.S.G. § 3B1.1 cmt. n.4. The list is non-exclusive, we have not necessarily given each factor equal weight, and we may uphold Longstreet's sentence on any ground in the record, regardless of the rationale used by the district court. *See Mustread*, 42 F.3d at 1104.

After reviewing the record and considering the above factors, we agree with the government that the evidence adequately supported Longstreet's leadership enhancement. As noted above and explained in the PSR, witnesses testified that Longstreet was the leader of a faction of the Four Corner Hustlers and controlled the drug business in a particular territory. He procured various harmful illegal drugs from a number of suppliers, employed and directed workers to mix and repackage them, and operated a variety of drug spots using other employees. For other dealers, such as Anthony Sutton, Longstreet charged rent for the right to sell within his territory and attempted to control the locations where those dealers set up shop. Sutton's testimony alone demonstrates that Longstreet sought to exert control over components of the charged conspiracy. But even without considering Longstreet's relationship with Sutton, Longstreet exercised control over many co-conspirators in this drug business, which is sufficient for the § 3B1.1 enhancement.

Throughout his brief, Longstreet attempts to downplay his role in the charged conspiracy, painting himself

as an out-of-touch former kingpin who is now struggling to regain some semblance of his former power and territory. But even the facts he raises support the leadership enhancement. For example, he notes as the "most telling evidence" of his minimal role that alleged co-conspirators admitted to ignoring some of his orders. But this fact necessarily implies that he was indeed *giving* orders, a characteristic consistent with someone in a leadership role. Similarly, he notes that "people routinely refused to pay Longstreet drug money owed to him." Unless we misunderstand the drug business—or any business, for that matter—one is not typically owed money unless he provided something in exchange. Although being a drug dealer, alone, is insufficient to support a leadership enhancement, *see Mustread*, 42 F.3d at 1104, the evidence at trial indicated that Longstreet was not out on the corner selling his own drugs; he directed and controlled other workers who sold drugs on his behalf. Rather than demonstrate a lesser role, the facts that Longstreet highlights simply indicate that he was not very good at the leadership role he actually possessed. There is ample evidence in the record of Longstreet's elevated role in this conspiracy, and we find no clear error below.

B. *Defendants Longstreet and Ervin—Consideration of the Crack/Powder Cocaine Ratio*

Both Longstreet and co-defendant Michael Ervin assert that they are entitled to a limited remand to permit the district court to reconsider the previously mandatory 100:1 crack/powder cocaine ratio. At the time Longstreet and

Ervin were sentenced in the spring of 2007, our precedent prohibited a district court from departing from the Sentencing Guidelines based on the disparity created by the crack/powder cocaine ratio. *See, e.g.*, *United States v. Miller*, 450 F.3d 270, 275 (7th Cir. 2006). Following their sentencings, however, the United States Supreme Court determined that a district court may deviate from the advisory guidelines range after considering the crack/powder cocaine disparity. *Kimbrough v. United States*, 552 U.S. 85 (2007). Consequently, a limited remand may be warranted to permit the district court to state whether it would have imposed a different sentence under *Kimbrough*. *United States v. Taylor*, 520 F.3d 746, 748 (7th Cir. 2008).

Both Longstreet and Ervin were sentenced based solely on crack cocaine quantities.[6] Neither defendant, however, raised this issue in the proceedings below, and we cannot determine whether the district court would have considered the disparity had it not been constrained by our pre-*Kimbrough* precedent. *See Taylor*, 520 F.3d at 748-49. Therefore, a limited remand is appropriate under *Taylor* to allow the district court to state whether it wishes to re-sentence Longstreet or Ervin in light of *Kimbrough*.

---

[6] Like Longstreet, Ervin trafficked in other drugs, but the PSR and district court determined that he was responsible for at least 1.5 kilograms of crack cocaine. Therefore, as with Longstreet, the crack quantity alone placed him in the highest base offense level, and the district court did not attempt to quantify the amount of other drugs attributable to him.

*C.  Zepeda's Challenges to His Sentence*

A third co-defendant, Anselmo Zepeda, also challenges his sentence. Zepeda was a supplier who worked with fellow co-conspirators to distribute drugs to other members of the conspiracy. Anthony Sutton was one of Zepeda's primary cocaine purchasers. On appeal, Zepeda claims that the district court did not have sufficient, reliable evidence to support the quantity of drugs it attributed to him and that the government failed to meet its burden of proving "relevant conduct" under U.S.S.G. § 1B1.3(a)(1)(B).

On November 7, 2006, Zepeda pled guilty, without a plea agreement, to the conspiracy to possess and distribute controlled substances alleged in Count One of the indictment. At his plea hearing, the government stated that if the case were to proceed to trial, it would demonstrate that Zepeda conspired to distribute over five kilograms of cocaine and quantities of marijuana. The government proffered that Zepeda distributed at least five kilograms of cocaine to Sutton, in kilogram or multi-kilogram quantities per transaction, with the understanding that Sutton would resell it. Specifically, in December 2004, Zepeda began supplying Sutton with one kilogram of cocaine approximately two times per week; within one month, the quantity of cocaine per transaction increased to three kilograms; and in March 2005, it increased again to five kilograms per transaction. Zepeda agreed that these statements represented the government's factual basis for his guilty plea.

The government's written factual basis for Zepeda's plea included these statements and also asserted that on

March 31, 2005, a co-conspirator attempted to deliver to Sutton six kilograms of Zepeda's cocaine, which Zepeda did not dispute. The factual basis also stated that Zepeda fronted Sutton with twenty-five pounds of marijuana on two occasions.

The probation officer attached the government's written factual basis for the plea to the PSR and recommended a finding that the total amount of drugs attributable to Zepeda was at least fifty kilograms of cocaine and approximately fifty kilograms of marijuana. The bases for these quantities were statements in the indictment, the written factual basis for the plea, and an interview with IRS Agent Chris Carlson. The PSR reflected the same transactions between Zepeda and Sutton from December 2004 to March 2005 that Zepeda admitted and that were detailed in the written factual basis for the plea, with one exception: the PSR did not mention the increase from one to three kilograms of cocaine that Zepeda supplied to Sutton within one month of December 2004. The PSR also found that Zepeda had engaged in "relevant conduct," *see* U.S.S.G. § 1B1.3(a)(1)(B), in that he supplied an individual with cocaine from the end of 1994 until the end of 1996 or early 1997, first in one-quarter kilogram quantities and later in two kilogram quantities.

The district judge considered the evidence in the record, accepted the PSR's calculation, and set Zepeda's base offense level at thirty-seven. The court applied a leadership enhancement, and it sentenced Zepeda to 210 months on the conspiracy count. Zepeda's main argument is that the district court did not have reliable

information to determine that Zepeda was responsible for over fifty kilograms of cocaine. He bases this assertion primarily on a perceived conflict between the PSR and Zepeda's own admissions regarding the increase to three-kilogram deliveries of cocaine to Sutton.

Zepeda did not object to the PSR's recommended quantity of drugs prior to the sentencing hearing, nor at the hearing itself. Consequently, he has forfeited his challenge, and we review the district court's calculation for plain error. *United States v. Jaimes-Jaimes*, 406 F.3d 845, 849 (7th Cir. 2005); *see also United States v. Middlebrook*, 553 F.3d 572, 577 (7th Cir. 2009). Under such a standard, we will correct only particularly egregious errors to prevent a miscarriage of justice, and even if there was plain error, the error must "'seriously affect[] the fairness, integrity, or public reputation of judicial proceedings'" to warrant reversal. *Middlebrook*, 553 F.3d at 578 (quoting *United States v. Cusimano*, 148 F.3d 824, 828 (7th Cir. 1998)). This standard is high, and we find no such error here.

As described above, *see supra* pt. II.A.4.a., the district court must determine the quantity of drugs attributable to a defendant by a preponderance of the evidence. *Krasinski*, 545 F.3d at 551. In so doing, the sentencing court "may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come," *United States v. Hankton*, 432 F.3d 779, 789 (7th Cir. 2005) (quotations omitted), as long as it has "sufficient indicia of reliability to support its probable accuracy," *Bautista*, 532 F.3d at 672. The district court, therefore, is not

limited to reviewing the PSR when calculating drug quantity; "what controls the analysis is the 'entire evidence' before the district court." *United States v. Sutton*, 406 F.3d 472, 474 (7th Cir. 2005) (quoting *United States v. Span*, 170 F.3d 798, 803 (7th Cir. 1999)); *see also Hankton*, 432 F.3d at 790 ("In determining reliability we consider the totality of the evidence before the sentencing judge."). We may affirm a sentence on any basis supported by the record, even evidence not relied on by the sentencing judge. *Sutton*, 406 F.3d at 474.

Particularly damaging to Zepeda's claim is that he gave the district court no reason to believe that the information upon which it relied to calculate the drug quantities was inaccurate. A district court may rely on a PSR's recommended calculations where the defendant fails to alert the court to potentially inaccurate or unreliable information. *See United States v. Artley*, 489 F.3d 813, 821 (7th Cir. 2007); *see also United States v. Jones*, 209 F.3d 991, 996 (7th Cir. 2000) (rejecting defendant's drug quantity challenge because a mere denial of PSR's truth is insufficient, and he failed to demonstrate that the information upon which the district court relied was inaccurate). On appeal, a defendant must show "that the information before the court was inaccurate, and that the court relied on it" to successfully challenge his sentence. *See Hankton*, 432 F.3d at 790 (quotations omitted). Zepeda has made no such showing.

Here, Zepeda not only failed to object to the PSR's recommended drug quantities, but he actually admitted during his plea colloquy that the government's evidence

would demonstrate a series of transactions involving cocaine quantities that, when added together, totaled at least fifty kilograms of cocaine. *Cf. Krasinski*, 545 F.3d at 552 ("Admissions in a plea agreement also conclusively establish the admitted facts."); *United States v. Warneke*, 310 F.3d 542, 550 (7th Cir. 2002) ("An admission is even better than a jury's finding beyond a reasonable doubt; it removes all contest from the case."). We have previously upheld a defendant's sentence based largely on the defendant's own admissions or a plea agreement. *See, e.g.*, *Krasinski*, 545 F.3d at 552 (using a range of ecstasy pills that defendant admitted to distributing to calculate the total quantity); *United States v. Arenal*, 500 F.3d 634, 639-40 (7th Cir. 2007) (upholding sentence based on defendant's admission of quantity in plea agreement); *Sutton*, 406 F.3d at 474 (upholding sentence even though defendant gave two different quantities of crack at plea colloquy).

The evidence before the district court—including the PSR, the government's factual basis for the plea, and Zepeda's own admissions—provided sufficiently reliable information for the district court's calculations, and we need not reach the drug quantities attributed to Zepeda as "relevant conduct." Zepeda admitted that the evidence at trial would demonstrate that he sold cocaine to Anthony Sutton two times per week from December 2004 to the end of March 2005, beginning with one kilogram deliveries, but increasing within one month to three kilograms per exchange. In March 2005, the amount increased again to five kilograms per transaction, and there was one additional attempted transaction for six kilograms. Zepeda sets forth what he deems the most

conservative number of transactions (twenty-seven), *see* Petr.'s Br. 10, but even using this number of transactions, multiplied by the weights that he admitted, the total amount exceeds fifty kilograms. The omission from the PSR of the increase to three-kilogram deliveries of crack to Sutton does not alter our conclusion. The PSR did not contradict Zepeda's own admissions, and the district court could rely on any evidence in the record. Further, a district court does not automatically commit clear error when it fails to use the most conservative calculation possible. *See Krasinski*, 545 F.3d at 553 (noting that district court could have employed a more conservative calculation, but that it based the quantity on information provided by the defendant *himself*). The district court had reliable support for holding Zepeda responsible for at least fifty kilograms of cocaine, and we therefore find no plain error that would result in a miscarriage of justice. *See Middlebrook*, 553 F.3d at 578. Consequently, we affirm Zepeda's sentence.

### III. CONCLUSION

We find no error in Longstreet's trial, and we AFFIRM his conviction. We also find no error in the district court's calculation of the quantity of drugs attributable to Longstreet, nor in its enhancement of his sentence based on his leadership role. However, the district court did not consider the crack/powder cocaine disparity when sentencing both Longstreet and Ervin, and we therefore order a LIMITED REMAND in both cases to allow the district court to consider whether it wishes to resentence

either defendant in light of *Kimbrough*. Last, the district court did not err in calculating Zepeda's base offense level, and we AFFIRM his sentence.